**[J-5-2025] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 37 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 1721 EDA |
| | : | 2022 entered on July 28, 2023, |
| v. | : | affirming the Judgment of Sentence |
| | : | of the Philadelphia County Court of |
| | : | Common Pleas at No. CP-51-CR- |
| ANTHONY LEWIS, | : | 0007345-2021 entered on June 30, |
| | : | 2022. |
| Appellant | : | |
| | : | ARGUED:  March 4, 2025 |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                              **DECIDED: September 25, 2025**

Both the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution guarantee the right of "the people" against unreasonable searches and seizures.[1]  This constitutional protection is not only for "some" people.  It is not only for people who live in affluent neighborhoods.  All people are "born equally free and independent,"[2] and all are entitled to the "equal protection of

---

[1]    U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."); PA. CONST. art. I, § 8 ("The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.").

[2]    PA. CONST. art. I, § 1.

the laws."[3]  Yet, under the misguided precedent of *Illinois v. Wardlow*[4] and its treatment of "high-crime areas," people in some neighborhoods are "more equal than others."[5]

For purposes of federal law, we are bound by the *Wardlow* Court's distortion of Fourth Amendment rights.  Nonetheless, for the reasons discussed in my previous writings[6] and developed further below, the prevailing law's treatment of "high-crime areas" is deeply problematic, and I would welcome the opportunity to abandon this aspect of federal law and correct the course that we chart under our own Constitution.

The neighborhood in which a *Terry* stop[7] occurs should have no bearing upon that stop's constitutional validity.  A person is not responsible for the crimes of his neighbors.  Absent a genuine, articulable, particularized, and individual basis to suspect a person of criminal activity, we should adhere to our first principles—the "people shall be secure in their persons,"[8] regardless of the neighborhood in which they find themselves.  The flip side of that coin is significant as well.  If, as in this case, reasonable suspicion does exist based upon the actual conduct of the suspect, then seizure of that suspect is

---

[3]  U.S. CONST. amend. XIV, § 1.

[4]  *Illinois v. Wardlow*, 528 U.S. 119 (2000).

[5]  GEORGE ORWELL, ANIMAL FARM 134 (75th Anniversary ed., Signet Classics 2020) (1945) ("All Animals are equal but some Animals are more equal than others.").

[6]  *See Commonwealth v. Dobson*, 307 A.3d 612, 625-26 (Pa. 2024) (Wecht, J., Opinion in Support of Reversal); *Commonwealth v. Galloway*, 284 A.3d 870, 875 (Pa. 2022) (Wecht, J., dissenting from the denial of allocatur).

[7]  *See Terry v. Ohio*, 392 U.S. 1, 27 (1968) (establishing what has come to be known as the "reasonable suspicion" standard for an investigative detention short of an arrest based upon probable cause); *Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019) (citing *Commonwealth v. Brown*, 996 A.2d 473, 476 (Pa. 2010); *Commonwealth v. Jackson*, 698 A.2d 571, 573 (Pa. 1997)) (noting that Pennsylvania law under Article I, Section 8 follows the *Terry* doctrine).

[8]  PA. CONST. art. I, § 8.

constitutionally permissible regardless of where the seizure occurs. The alleged nature of the surrounding area adds nothing of value to the equation.

Cautionary words to the contrary notwithstanding, today's Majority approves of standardless invocations of the magic words "high-crime area," and leaves the interpretation of that Cain-like mark to the unfettered discretion of trial courts. I dissent from the Majority's constitutional analysis. Nonetheless, I agree as to the ultimate disposition of this case, because here police officers had reasonable suspicion to stop Anthony Lewis, and their ensuing pursuit and ultimate recovery of the firearm in Lewis' possession were lawful. Resort to the "high-crime area" crutch was as unnecessary as it was constitutionally infirm. I therefore concur only in the result.

## I. The *Terry* Doctrine

Because the issue at hand revolves around the scope of the *Terry* doctrine, it is helpful to review the critical limitations upon the authority from which such seizures emanate. It is also worth remembering that none of the *Terry* doctrine's buzzwords— "stop and frisk," "investigative detention," "reasonable suspicion," etc.—appear in the text of the United States or Pennsylvania Constitutions. The textual constitutional standard— "probable cause"—is what establishes the "general rule" for a "reasonable" seizure.[9] Nonetheless, given that "the Fourth Amendment's ultimate touchstone is 'reasonableness,'"[10] the Court in *Terry* balanced the competing interests to conclude that

---

[9] *See Dunaway v. New York*, 442 U.S. 200, 213 (1979) (identifying the "general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause"); *see also id.* ("The familiar threshold standard of probable cause for Fourth Amendment seizures reflects the benefit of extensive experience accommodating the factors relevant to the 'reasonableness' requirement of the Fourth Amendment, and provides the relative simplicity and clarity necessary to the implementation of a workable rule.").

[10] *Brigham City, Utah v. Stuart*, 547 U.S. 398, 398 (2006).

a lesser form of seizure of the person can be constitutionally reasonable.[11]  As the Court

subsequently has summarized:

> In a pathmarking decision, [*Terry*], the Court considered whether an investigatory stop (temporary detention) and frisk (patdown for weapons) may be conducted without violating the Fourth Amendment's ban on unreasonable searches and seizures.  The Court upheld "stop and frisk" as constitutionally permissible if two conditions are met.  First, the investigatory stop must be lawful.  That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense.  Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous.[12]

"*Terry* for the first time recognized an exception to the requirement that Fourth

Amendment seizures of persons must be based on probable cause."[13]  That exception

was meant to be a limited one—a "narrowly drawn authority"[14] allowing for "brief and

narrowly circumscribed intrusions."[15]  The *Terry* stop has since proliferated into a

"cornerstone of modern law enforcement methods," as it has proven itself to be "a

practical tool" to "encourage the effective investigation and prevention of crime, while

maintaining a balance between the constitutionally protected privacy interests of the

individual and the needs and safety of law enforcement personnel."[16]  It can also be a

---

[11]  *Terry*, 392 U.S. at 9 ("For what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.  Unquestionably petitioner was entitled to the protection of the Fourth Amendment as he walked down the street in Cleveland.  The question is whether in all the circumstances of this on-the-street encounter, his right to personal security was violated by an unreasonable search and seizure.") (citations and internal quotation marks omitted).

[12]  *Arizona v. Johnson*, 555 U.S. 323, 326-27 (2009).

[13]  *Dunaway*, 442 U.S. at 208-09.

[14]  *Terry*, 392 U.S. at 27.

[15]  *Dunaway*, 442 U.S. at 212.

[16]  *Hicks*, 208 A.3d at 921.

dangerous tool, for "the protections intended by the Framers could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the 'often competitive enterprise of ferreting out crime.'"[17]

As the *Terry* doctrine has grown, so too has the number of attempts to articulate a clear standard for the inherently slippery concept of "reasonable suspicion." Although reasonable suspicion has been characterized as an "elusive"[18] and "fluid"[19] standard that cannot be "reduced to a neat set of legal rules,"[20] there are concrete attributes of the analysis that provide meaningful guidance, and which impose important guardrails. In a widely quoted passage, the *Terry* Court explained that reasonable suspicion requires more than an "inchoate and unparticularized suspicion or 'hunch.'"[21] Rather, to justify an investigative detention, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[22]

In its *Cortez* decision, the Court acknowledged that "[t]erms like 'articulable reasons' and 'founded suspicion' are not self-defining; they fall short of providing clear guidance dispositive of the myriad factual situations that arise."[23] Yet, the *Cortez* Court

---

[17]   *Dunaway*, 442 U.S. at 213 (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

[18]   *United States v. Cortez*, 449 U.S. 411, 417 (1981).

[19]   *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

[20]   *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).

[21]   *Terry*, 392 U.S. at 27.

[22]   *Id.* at 21.

[23]   *Cortez*, 449 U.S. at 417.

was able to articulate several guiding principles. The "essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[24]

The *Cortez* Court further explained that the "idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible."[25] First, the determination of reasonable suspicion is based upon the totality of the circumstances, which "proceeds with objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers."[26] The Court elaborated that this "process does not deal with hard certainties, but with probabilities."[27] "Long before the law of probabilities was articulated as such, practical people formulated certain common sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers."[28] But, the Court stressed, probabilities and generalities alone are not sufficient due to the second necessary component of reasonable suspicion: the need for *particularized* suspicion of criminality. *Cortez* continued:

> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing. Chief Justice Warren, speaking for the

---

[24] *Id.* at 417-18 (citing *Brown v. Texas*, 443 U.S. 47, 51 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)).

[25] *Id.* at 418.

[26] *Id.*

[27] *Id.*

[28] *Id.*

Court in *Terry v. Ohio, supra*, said that, "[t]his demand for specificity in the information upon which police action is predicated is *the central teaching of this Court's Fourth Amendment jurisprudence*."[29]

As the "central teaching" of Fourth Amendment jurisprudence, the need for "particularized" and "individualized" suspicion of wrongdoing has, unsurprisingly, been a core component of the *Terry* doctrine since its origination. The reason is simple—each individual has a personal, constitutional right to be free from unreasonable searches and seizures. As the *Terry* Court stressed: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."[30] And this "inestimable right of personal security belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs."[31] Absent some other legitimate and recognized exception, the shield provided by this individual right can be penetrated only by an individualized justification.[32]

---

[29]     *Id.* (quoting *Terry*, 392 U.S. at 21 n.18) (emphasis in original).

[30]     *Terry*, 392 U.S. at 9 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

[31]     *Id.* at 8-9.

[32]     *See, e.g.*, *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000) (citing *Chandler v. Miller*, 520 U.S. 305, 308 (1997)) ("A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing."); *Brown*, 443 U.S. at 51 ("[T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."); *Delaware v. Prouse*, 440 U.S. 648, 661 (1979) (quoting *Terry*, 392 U.S. at 22) ("To insist neither upon an appropriate factual basis for suspicion directed at a particular automobile nor upon some other substantial and objective standard or rule to govern the exercise of discretion 'would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches . . . .'").

## II. *Illinois v. Wardlow*

The need for particularized suspicion, however, received markedly less emphasis in *Wardlow* through the Court's treatment of "high-crime areas." The *Wardlow* Court did make one reference to the particularization requirement, noting that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."[33] Yet, *Wardlow* concluded, an individual's presence in a "high-crime area" is "among the relevant contextual considerations in a *Terry* analysis," and police officers "are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."[34] Thus, coupled with one extra factor—there, flight from a police officer—the *Wardlow* Court reasoned that presence in a high-crime area *does* establish reasonable suspicion justifying a *Terry* stop.

As the *Wardlow* Court explained, the case before it involved "not merely respondent's presence in an area of heavy narcotics trafficking," but also "his unprovoked flight upon noticing the police."[35] The Court noted that evasive behavior can contribute to a finding of reasonable suspicion, and "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."[36] Upon observing the suspect's flight in a high-crime area, the *Wardlow* Court thus concluded, the police officer in that case was justified in detaining the suspect.

---

[33] *Wardlow*, 528 U.S. at 124 (citing *Brown*, 443 U.S. at 47).

[34] *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 144 (1972)).

[35] *Id.*

[36] *Id.*

The *Wardlow* Court then asserted that its "holding is entirely consistent with" its decision in *Florida v. Royer*, in which the Court "held that when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business."[37]  It then quoted *Florida v. Bostick* for the proposition that, when an officer approaches an individual without reasonable suspicion or probable cause, any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."[38]  "But," the *Wardlow* Court opined, "unprovoked flight is simply not a mere refusal to cooperate."[39]  "Flight, by its very nature, is not 'going about one's business'; in fact, it is just the opposite. Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning."[40]

Finally, the *Wardlow* Court acknowledged the criticism that its holding would allow for the seizure of many innocent people, for "there are innocent reasons for flight from police,"[41] and many people who live or work in "high-crime areas" are committing no crime at all.  Dismissing that concern, the *Wardlow* Court declared: "In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people."[42]  Innocent people may

---

[37]  *Id.* at 125 (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).

[38]  *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

[39]  *Id.*

[40]  *Id.*

[41]  *Id.*

[42]  *Id.* at 126.

also be arrested at times, the *Wardlow* Court stated, and a "*Terry* stop is a far more minimal intrusion."[43]

This analysis did not satisfy Justice Stevens, who dissented in part in *Wardlow*, finding that the suspect's flight in a high-crime area did not furnish sufficient grounds to detain him.[44] Justice Stevens emphasized that there are many innocent reasons that an individual may be observed running in public, and, even where a person runs because he sees a police officer, such conduct remains too ambiguous to justify an inference of criminality. Quoting a decision from 1896, Justice Stevens related that it "is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses," or they may flee "because they do not wish their names to appear in connection with criminal acts, are humiliated at being obliged to incur the popular odium of an arrest and trial, or because they do not wish to be put to the annoyance or expense of defending themselves."[45] Justice Stevens pointed out that the sudden appearance of police officers might also indicate to reasonable people that the officers are responding to nearby criminal activity and, therefore, potential danger—considerations that "can lead to an innocent and understandable desire to quit the vicinity with all speed."[46]

---

[43]     *Id.*

[44]     *See id.* at 126-40 (Stevens, J., concurring in part and dissenting in part). Justice Stevens concurred with the majority in *Wardlow* to the extent that it rejected the parties' countervailing suggestions of *per se* rules—that flight from police officers, by itself, *always* or *never* establishes reasonable suspicion. Justices Souter, Ginsburg, and Breyer joined Justice Stevens' opinion in *Wardlow*.

[45]     *Id.* at 131 (quoting *Alberty v. United States*, 162 U.S. 499, 511 (1896)).

[46]     *Id.*

Justice Stevens further spoke to the significance of an area being designated as "high-crime" and the conclusions that one reasonably might draw—or not draw—from observing an individual's flight from police officers in such an area. Citing to a vast array of scholarship, studies, surveys, and reports from police departments and other government officials, Justice Stevens observed:

> Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence. For such a person, unprovoked flight is neither "aberrant" nor "abnormal." Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices. Accordingly, the evidence supporting the reasonableness of these beliefs is too pervasive to be dismissed as random or rare, and too persuasive to be disparaged as inconclusive or insufficient. In any event, just as we do not require "scientific certainty" for our commonsense conclusion that unprovoked flight can sometimes indicate suspicious motives, neither do we require scientific certainty to conclude that unprovoked flight can occur for other, innocent reasons.[47]

Continuing in this vein, after proceeding through the facts of the seizure before the Court and explaining why none of them—individually or in the aggregate—lent themselves to a finding of reasonable suspicion, Justice Stevens concluded:

> The State, along with the majority of the Court, relies as well on the assumption that this flight occurred in a high crime area. Even if that assumption is accurate, it is insufficient because even in a high crime neighborhood unprovoked flight does not invariably lead to reasonable suspicion. On the contrary, because many factors providing innocent motivations for unprovoked flight are concentrated in high crime areas, the character of the neighborhood arguably makes an inference of guilt less appropriate, rather than more so. Like unprovoked flight itself, presence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry.[48]

---

[47] *Id.* at 132-35 (citations and footnotes omitted).

[48] *Id.* at 139.

### III. "High-Crime Areas"

Following *Wardlow*, it is clear as a matter of Fourth Amendment law that an investigative detention may be premised upon just two facts: "unprovoked flight" taking place in a "high-crime area."[49] The effect of *Wardlow*'s holding, therefore, was to render the "high-crime" character of a neighborhood into a highly significant—and often dispositive—factor in search-and-seizure analyses. Given the effectiveness of these magic words in persuading courts to bless otherwise-questionable seizures, it is wholly unsurprising that designating an area as "high-crime" has, as I previously have noted, "become a box-checking heuristic for law enforcement in search-and-seizure cases."[50] As prominent commentators similarly have observed: "The term 'high-crime area' has become a familiar 'talismanic litany' often quoted and almost always determinative in

---

[49] Some courts, such as the Supreme Court of Maryland (which reads the search and seizure provision of its own constitution in lockstep with the Supreme Court of the United States' treatment of the Fourth Amendment) have sought to characterize *Wardlow*'s holding as premised upon a totality-of-the-circumstances inquiry that considered "unprovoked flight" and the "high-crime area" as mere factors, rather than establishing a *per se* rule. *See Washington v. State*, 287 A.3d 301, 308-09 (Md. 2022) ("[I]n *Wardlow*, the Supreme Court did not establish a *per se* rule that unprovoked flight in a high-crime area always gives rise to reasonable articulable suspicion for a *Terry* stop."). Although this characterization may provide such courts with a basis to depart from *Wardlow* without engaging in independent analysis of their state constitutions, a straightforward reading of *Wardlow* reveals that the Court did, indeed, hold that the reasonable-suspicion inquiry may be reduced to just these two factors as a matter of law. Both this Court and leading scholars have so concluded. *See In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001) ("Following [*Wardlow*], it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment."); Andrew Guthrie Ferguson & Damien Bernache, *The "High-Crime Area" Question: Requiring Verifiable and Quantifiable Evidence for Fourth Amendment Reasonable Suspicion Analysis*, 57 Am. U. L. Rev. 1587, 1589 (2008) ("While never yet allowing the character of the neighborhood to be the sole justification for a stop based on reasonable suspicion, [the Supreme Court of the United States] has narrowed the totality of circumstances needed to two factors: 'high-crime area' and unprovoked flight from police.").

[50] *Galloway*, 284 A.3d at 875 (Wecht, J., dissenting from the denial of *allocatur*).

legitimating the police conduct of stopping an individual. The conclusion in legal opinions, among scholars, and on the street is the same: a high-crime area designation almost always shifts the analytical balance toward a finding of reasonable suspicion."[51]

Although one might attempt to downplay the significance of the "high-crime area" label as merely a single factor in the totality-of-the-circumstances inquiry, the often-dispositive nature of the designation is easily demonstrated on the face of our own precedent. Several years before *Wardlow*, this Court in *Commonwealth v. Matos* held that flight from a police officer, by itself, does not provide sufficient grounds for a seizure under Article I, Section 8 of the Pennsylvania Constitution, and that objects "discarded by a person fleeing a police officer are the fruits of an illegal 'seizure' where the officer possessed neither 'probable cause' to arrest the individual nor reasonable suspicion to stop the individual and conduct a *Terry* frisk."[52] This Court subsequently has cited *Matos* for the proposition that "flight alone does not constitute reasonable suspicion."[53] Yet, in the *D.M.* case—on remand from the Supreme Court of the United States' vacatur following *Wardlow*—this Court adopted *Wardlow* and declined to part ways with that decision for purposes of the Pennsylvania Constitution. Per *Wardlow*, this Court in *D.M.* held, "it is evident that unprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment."[54] Because this Court did not then proceed to conduct an independent analysis under Article I, Section

---

[51]     Ferguson & Bernache, *supra* n.49, at 1590 (quoting *Curtis v. United States*, 349 A.2d 469, 472 (D.C. 1975)) (footnote omitted).

[52]     *Commonwealth v. Matos*, 672 A.2d 769, 770 (Pa. 1996). This Court's decision in *Matos* was a departure from the Supreme Court of the United States' decision in *California v. Hodari D.*, 499 U.S. 621 (1991), premised upon the greater privacy protections of Article I, Section 8 of the Pennsylvania Constitution.

[53]     *Commonwealth v. Cook*, 735 A.2d 673, 677 (Pa. 1999) (citing *Matos*).

[54]     *D.M.*, 781 A.2d at 1164.

8, the *D.M.* Court presumably found the *Wardlow* approach to be sufficient under the Pennsylvania Constitution, as well.[55] Thus, per *Matos*, flight alone is insufficient to justify an investigative detention as a general matter, but, per *D.M.*, the mere addition of the "high-crime area" label transforms an unconstitutional seizure into a lawful one. The magic words cast a powerful spell indeed.

Given the prominence and potency of the "high-crime area" designation in post-*Wardlow* search and seizure jurisprudence, it is worthwhile to consider the persuasive force—or lack thereof—in *Wardlow*'s justifications for its holding. Although *Wardlow* gave the Court's imprimatur to the "relevant characteristics of a location" as "among the relevant contextual considerations in a *Terry* analysis,"[56] the Court had remarkably little else to say about "high-crime areas." Most of *Wardlow*'s brief analysis concerned the inferences that a police officer reasonably may draw from a suspect's flight.

Although the *Wardlow* Court insisted that its treatment of an individual's flight from police officers was consistent with its previous decisions in *Royer* and *Bostick*—that people approached by police officers without reasonable suspicion or probable cause have a right to disregard the police and to go about their business, and such refusal to cooperate does not furnish sufficient grounds for a detention—*Wardlow*'s assertion of consistency with those propositions is dubious. *Wardlow* declared that "unprovoked flight is simply not a mere refusal to cooperate," and that flight "is not 'going about one's

---

[55]    *But see id.* at 1165 (Zappala, J., dissenting) ("I find the majority writer's present change of position regarding our disposition of this matter pursuant to Article 1, Section 8 perplexing. In our original opinion addressing this matter, we relied upon both the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution in holding that the police officer here did not possess the requisite cause to stop appellant based upon flight alone. While the United States Supreme Court's decision in *Wardlow* impacts upon our analysis as it relates to the Fourth Amendment, the Court's decision is not dispositive of our state constitutional analysis.") (citation omitted).

[56]    *Wardlow*, 528 U.S. at 124.

business'; in fact, it is just the opposite."[57]  Without any further explanation, the *Wardlow* Court then declared that approving seizures on that basis "is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning."[58]  This exercise in hair-splitting is questionable at best.  The distinction appears to be that a person *walking* away from police officers attempting to question him without cause is completely permissible and unsuspicious, but running (or jogging, or walking quickly, perhaps) is sufficiently suspicious to justify a *Terry* stop—so long as he does so in a "high-crime area."  Despite *Wardlow*'s insistence to the contrary, it appears that one does not, in fact, have a right to "go about his business" if one happens to have the misfortune to encounter a police officer in a "high-crime area," for the attempt to do so runs an exceptional risk of being characterized as "flight" justifying an investigative detention.  As the Connecticut Supreme Court has astutely observed on this point:  "It would be ironic, to say the least, if we were to rely on a defendant's freedom to leave as evidence that there was not a seizure but then rely on the mere exercise of that ability to conclude that there is a reasonable suspicion that justifies a seizure."[59]

The only other point that the *Wardlow* Court offered in support of its reasoning was the singularly unpersuasive suggestion that, although innocent people in high-crime areas may flee from police for a variety of reasons, "*Terry* accepts the risk that officers may stop innocent people," and that this risk is acceptable because such seizures are a "more minimal intrusion" than an arrest.[60]  These remarks are astoundingly cavalier.  A *Terry* stop may, indeed, be a more "minimal" intrusion than an arrest, but as *Terry* itself

---

[57]     *Id.* at 125.

[58]     *Id.*

[59]     *State v. Edmonds*, 145 A.3d 861, 884 (Conn. 2016) (emphasis omitted).

[60]     *Wardlow*, 528 U.S. at 126.

acknowledged, the stop-and-frisk procedure that it approved constitutes a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly."[61]  It is true that ambiguous conduct may sometimes give rise to reasonable suspicion even though the suspect is, in fact, wholly innocent.  But it remains that the seizure of innocent people is a wrong that is to be avoided, not embraced or casually dismissed as inconsequential.

I favor the far more persuasive position articulated in the dissenting portion of Justice Stevens' opinion in *Wardlow*, particularly as it concerns the utility of the "high-crime area" factor.  "[P]resence in a high crime neighborhood is a fact too generic and susceptible to innocent explanation to satisfy the reasonable suspicion inquiry."[62]

In previous cases, I have expressed my opposition to the continued use of the "high-crime area" factor when assessing the lawfulness of a *Terry* stop.[63]  I reiterate that position again today.  In my view, even setting aside commonly cited, legitimate concerns with disparate impact upon racial minorities and people who live in impoverished areas, my primary objection is that overreliance upon the "high-crime area" factor fails to satisfy the fundamental requirements of the *Terry* doctrine.  As I emphasized above, the *Terry* doctrine always has required that reasonable suspicion be "particularized" to the individual suspect.  As the Supreme Court of the United States has made abundantly clear, "detaining officers must have a *particularized* and objective basis for suspecting the

---

[61]     *Terry*, 392 U.S. at 17.

[62]     *Wardlow*, 528 U.S. at 139 (Stevens, J., concurring and dissenting).

[63]     *See Dobson*, 307 A.3d at 624 (Wecht, J., Opinion in Support of Reversal) ("[T]he time to reconsider whether the high-crime area designation—which is often invoked in quasi-totemic fashion and supported by nothing more than a bald assertion by an individual police officer—is a relevant constitutional factor in our search and seizure analysis is long overdue."); *see also Galloway*, 284 A.3d at 875 (Wecht, J., dissenting from denial of *allocatur*).

*particular* person stopped of criminal activity,"[64] for the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."[65]  As I observed in *Dobson*, "the blanket assertion that an area is a high-crime area contravenes the requirement that reasonable suspicion (or probable cause) be particular to the individual suspect."[66]  Because the characterization of a neighborhood as "high-crime" is not particularized to any individual, this "necessarily means that factors contributing to reasonable suspicion begin to accrue against every person in that neighborhood as soon as that police officer starts his or her shift."[67]  As I noted similarly in *Galloway*, "relying upon such a premise means that probable cause or reasonable suspicion begins to tally against each and every person who steps foot in" a purportedly high-crime area, "whether for leisure, business, or residency, simply by being present, which erodes the requirement of individualized suspicion."[68]

For similar reasons, the use of the "high-crime area" factor is further in tension with the other core aspect of the reasonable-suspicion analysis discussed in *Cortez*—that the totality-of-the-circumstances inquiry is concerned with "probabilities" rather than "hard certainties," because police officers are permitted to draw "certain common sense conclusions about human behavior."[69]  To rely upon the "high-crime" nature of a neighborhood as a central component of a finding of reasonable suspicion, one must

---

[64]  *Cortez*, 449 U.S. at 417-18 (emphasis added).

[65]  *Id.* at 418 (quoting *Terry*, 392 U.S. at 21 n.18) (emphasis omitted).

[66]  *Dobson*, 307 A.3d at 625 (Wecht, J., Opinion in Support of Reversal).

[67]  *Id.*

[68]  *Galloway*, 284 A.3d at 875 (Wecht, J., dissenting from denial of *allocatur*).

[69]  *Cortez*, 449 U.S. at 418.

presume that it is "probable" that a person is a criminal merely because he is present in the targeted area. But "common sense" tells us that the vast majority of people, even in high-crime areas, are simply going about their lives, hoping to do so in peace. To borrow from the Supreme Court of Washington: "It is beyond dispute that many members of our society live, work, and spend their waking hours in high crime areas, a description that can be applied to parts of many of our cities. That does not automatically make those individuals proper subjects for criminal investigation."[70]

So long as the "high-crime area" continues to be a significant factor in the *Terry* doctrine, then wherever one draws the boundaries of a such an area, the very act of doing so necessarily serves to reduce the privacy protections of every person therein. Reliance upon this factor thus not only "undermines the requirements of individualized suspicion," but it "disserves the millions of law-abiding citizens who live in and travel to and from those places, who are no less entitled to the Constitution's protections because of that unfortunate statistical circumstance."[71] People in these areas are just as entitled as anyone else to the rights secured by both the Fourth Amendment and Article I, Section 8 of the Pennsylvania Constitution. Yet, under *Wardlow*'s constitutionalization of "high-crime areas," people therein do not receive equal treatment. As scholars have observed, "individuals in those areas have different Fourth Amendment protections than they would in other locations in the same town, city, or state. This development represents a significant shift away from equal constitutional protections for all citizens."[72]

---

[70]     *State v. Weyand*, 399 P.3d 530, 536 (Wash. 2017) (quoting *State v. Larson*, 611 P.2d 771, 775 (Wash. 1980)).

[71]     *Galloway*, 284 A.3d at 875 (Wecht, J., dissenting from denial of allocatur).

[72]     *See* Ferguson & Bernache, *supra* n.49, at 1589 (footnotes omitted).

I am far from alone in my observation of the infirmities of the jurisprudence surrounding "high-crime areas." Criticism of "high-crime area" invocations, both before and after *Wardlow*, is the subject of an enormous volume of scholarship, whether due to the factor's standardless employment, amorphous definition, and uncertain boundaries; because of its tendency to have a disproportionate impact upon racial minorities and the economically downtrodden; or due to some combination of these concerns.[73] The "sustained scholarly assault on citing 'high-crime' areas to bolster findings of reasonable

---

[73] *See, e.g.*, Ferguson & Bernache, supra n.49; Aliza Hochman Bloom, *Whack-A-Mole Reasonable Suspicion*, 112 CAL. L. REV. 1129, 1148-51 (2024); Jack T. Vanderford, Comment, Wardlow *Revisited: How Media Coverage of Police Brutality Makes Empirical Data More Relevant Than Ever*, 22 U. PA. J. CONST. L. 1523 (2020); Ben Grunwald & Jeffrey Fagan, *The End of Intuition-Based High-Crime Areas*, 107 CAL. L. REV. 345 (2019); Aliza Hochman Bloom, *When Too Many People Can Be Stopped: The Erosion of Reasonable Suspicion Required for a* Terry *Stop*, 9 ALA. C.R. & C.L.L. REV. 257, 265-67, 272-73 (2018); Jeffrey Fagan, et. al., *Stops and Stares: Street Stops, Surveillance, and Race in the New Policing*, 43 FORDHAM URB. L.J. 539, 556-57, 566 (2016); Reshaad Shirazi, *It's High Time to Dump the High-Crime Area Factor*, 21 BERKELEY J. CRIM. L. 76 (2016); Samuel Goldsmith, Note, *The Misguided Constitutionalization of the Enabled Police Force*, 8 GEO. J.L. & MOD. CRITICAL RACE PERSP. 191, 196-204 (2016); Jeffrey Fagan & Amanda Geller, *Following the Script: Narratives of Suspicion in* Terry *Stops in Street Policing*, 82 U. CHI. L. REV. 51, 58, 78-79 (2015); Andrew Dammann, Note, *Categorical and Vague Claims That Criminal Activity Is Afoot: Solving the High-Crime Area Dilemma Through Legislative Action*, 2 TEX. A&M L. REV. 559 (2015); Hannah Rose Wisniewski, *It's Time to Define High-Crime: Using Statistics in Court to Support an Officer's Subjective "High-Crime Area" Designation*, 38 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 101 (2012); L. Song Richardson, *Cognitive Bias, Police Character, and the Fourth Amendment*, 44 ARIZ. ST. L.J. 267, 281-86, 291-92 (2012); Thomas R. Fulford, Note, *Writing Scripts for Silent Movies: How Officer Experience and High-Crime Areas Turn Innocuous Behavior into Criminal Conduct*, 45 SUFFOLK U. L. REV. 497 (2012); Andrew Guthrie Ferguson, *Crime Mapping and the Fourth Amendment: Redrawing "High-Crime Areas"*, 63 HASTINGS L.J. 179 (2011); Christopher Slobogin, *The Poverty Exception to the Fourth Amendment*, 55 FLA. L. REV. 391, 405 (2003); David Seawell, Wardlow*'s Case: A Call to Broaden the Perspective of American Criminal Law*, 78 DENV. U. L. REV. 1119 (2001); Andrea Wang, Illinois v. Wardlow *and the Crisis of Legitimacy: An Argument for A "Real Cost" Balancing Test*, 19 LAW & INEQ. 1 (2001); Margaret Raymond, *Down on the Corner, Out in the Street: Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion*, 60 OHIO ST. L.J. 99 (1999); David A. Harris, *Factors for Reasonable Suspicion: When Black and Poor Means Stopped and Frisked*, 69 IND. L.J. 659 (1994).

suspicion"[74] also finds an echo in the commentary of numerous jurists, both in Pennsylvania and elsewhere.

As I noted in *Dobson*, the late Chief Justice Baer once opined that "the 'high-crime' nature of the neighborhood" should not be treated as a "relevant factor" in a finding of probable cause, explaining that:

> The unfortunate result of today's decision is that the low socio-economic character of a neighborhood will now be enough to suffice the rigorous standards of probable cause for any citizen, not just the street-level heroin dealer. While I understand that, in the social norms of today's world, drug transactions may occur more often in neighborhoods such as the one here, the rights of Pennsylvania residents in both high-crime and low-crime areas remain the same under our Constitution. To be sure, if police can now use evidence of the high-crime nature of the neighborhood to demonstrate probable cause, then the simple action of shaking a friend's hand upon greeting will subject those friends potentially to being searched and seized, while the same occurrence in a low-crime area will not. Such a conclusion is patently offensive to our longstanding constitutional principles protecting every person in our society from intrusive action by the state, even in the face of an ever-increasing drug problem on our streets.
>
> I fully realize that a drug transfer in this case could have occurred, and that probable cause does not require absolute certainty. Nevertheless, the regrettable outcome of this decision places the deciding factor in a case, not on the perceived action, but rather on the location of that action. Again, while an arresting officer may be proved correct in his hunch, such is not an accepted constitutional norm.[75]

In that same case, then-Justice, now-Chief Justice Todd similarly observed that the contention that the transaction at issue occurred in a "high drug crime location" was "rooted in past unrelated events" and did not "establish a fair probability that *this particular* transaction was criminal in nature, absent other surrounding indicia of criminality."[76] Chief

---

[74]    Bloom, *Whack-A-Mole Reasonable Suspicion*, *supra* n.73, at 1150.

[75]    *Commonwealth v. Thompson*, 985 A.2d 928, 944 (Pa. 2009) (Baer, J., concurring) (citations omitted).

[76]    *Id.* at 952 (Todd, J., dissenting) (emphasis in original).

Justice Todd further cited scholarship expressing criticism of the "high-crime area" factor.[77]

The late Judge Strassburger of our Superior Court likewise expressed his "discontent with the Commonwealth's reliance on the 'high-crime area' factor in support of a finding of probable cause"—a factor that he believed should "not be relevant" to the inquiry.[78] Summing up the issue rather well in a single sentence, Judge Strassburger said: "People who live in poor areas that are riddled with crime do not have fewer constitutional rights than people who have the means to live in 'nice' neighborhoods."[79]

Unsurprisingly, jurists in other jurisdictions have expressed these same objections. To take just a few, Judge Gregory of the United States Court of Appeals for the Fourth Circuit has declared that he "cannot accept that Fourth Amendment protections are suspended or reduced in so-called 'high-crime' neighborhoods," explaining:

> "[H]igh-crime" areas are often low-income areas. By creating zones of lower constitutional protection in poor neighborhoods, the majority, albeit unwittingly, engages in a blatant display of class discrimination of the basest variety. It has never been my understanding of the Fourth Amendment that those with less means likewise receive less constitutional protection as a result of their plight. It is written into the very fiber of our Constitution that the protections granted therein apply equally to all Americans, regardless of whether they are returning home to the grandest of mansions or the humblest of shanties. Such a broad reading of "reasonable articulable suspicion" significantly limits the freedom of people who happen to be in an

---

[77]    *Id.* at 952 n.9 (Todd, J., dissenting) (quoting Raymond, *supra* n.73, at 132-33; WAYNE R. LAFAVE, 2 SEARCH AND SEIZURE, FOURTH EDITION § 3.6, 368 n. 224; James R. Acker, *Social Sciences and the Criminal Law: The Fourth Amendment, Probable Cause, and Reasonable Suspicion*, 23 CRIM.L.BULL. 49, 79 (1987)).

[78]    *Commonwealth v. Barr*, 240 A.3d 1263, 1291 (Pa. Super. 2020) (Strassburger, J., concurring), *rev'd on other grounds*, 266 A.3d 25 (Pa. 2021). Judge Strassburger's concurrence in *Barr* was joined by President Judge Emeritus Bender and Judge Lazarus.

[79]    *Id.*

area deemed "high crime." Surely, the Constitution cannot support such an arbitrary and discriminatory result.[80]

Along similar lines, Justice Dallet of the Wisconsin Supreme Court recently commented:

> Accepting without scrutinizing a claim that an area is a "high-crime area" unwittingly makes all residents and visitors in such areas more susceptible to searches and seizures, thereby treating them as though they are "less worthy of Fourth Amendment protection." *United States v. Curry*, 965 F.3d 313, 331 (4th Cir. 2020). We must guard against such unequal treatment and ensure that the Fourth Amendment offers the same protection to everyone, no matter their location.[81]

Although there are far more jurists who have recognized these ills, one more quotation will suffice to illustrate the breadth of salient judicial criticism. Well before *Wardlow*, Judge Harper of the Court of Appeals of Ohio wrote in dissent:

> I will not shy away from stating what the majority is afraid to state in print. The majority of this court today, as has been the recent trend in this court, is actually holding that, as a matter of law, those unfortunate black, Hispanic and poor white citizens who by virtue of their economic and social status live in the so-called "high crime areas" are suspects. The law makes them suspects who should be seized and searched just because a police officer who happens to have a couple of years' experience in the force says so. Any law that boldly condemns its citizens and renders them less than other citizens for purposes of constitutional protection based on their economic and social standing in that community is a bad law and has no place in a constitutional democracy.[82]

As the above-cited scholarship and judicial expressions make clear, the ills of the "high-crime area" factor are well-understood and thoroughly documented. We should finally take heed of them. As a matter of Pennsylvania constitutional law, I believe that

---

[80] *United States v. Black*, 525 F.3d 359, 366, 370 (4th Cir. 2008) (Gregory, J., dissenting).

[81] *State v. Genous*, 961 N.W.2d 41, 49 (Wis. 2021) (Dallet, J., dissenting).

[82] *State v. Ward*, 610 N.E.2d 579, 582 (Ohio Ct. App. 1992) (Harper, J., dissenting) (citations omitted).

the "high-crime" nature of a neighborhood or other geographical area is irrelevant to the lawfulness of a seizure. I would allow for a police officer's prior knowledge of specific criminal activity to weigh in the balance only if it is focused upon a narrow, precise, and particular location, such as a *specific* house, storefront, vehicle, etc. The commonly invoked, broad characterizations of entire neighborhoods and the like as "high-crime" are too dangerous to liberty to continue to tolerate, and we should discard them as a matter of Pennsylvania constitutional law.

Such a conclusion would not mean that law enforcement agencies would be prohibited from directing additional resources toward areas in which a disproportionate amount of crime is concentrated, nor would it require individual police officers to disregard their experience with certain areas or their awareness of the sort of crime that is prevalent in them. Police officers' intuition and experience are properly used every day—indeed, every hour and minute—to make choices and decisions about patrol priorities, physical and electronic surveillance, resource allocation, and all manner of other proper law enforcement activities. Removing the crutch of the "high-crime area" designation from the *Terry* analysis would not stifle these actions or interfere with the lawful exercise of law enforcement duties. It would simply mean that, when a police officer seizes a person, that seizure would need to be justified by reasonable, articulable suspicion that is particularized to the conduct of the individual suspect, and not premised in whole or in part upon the person's mere presence in a geographical area that is shared by hundreds, thousands, or millions of wholly innocent people.

## IV. The Majority Opinion

Today's Majority achieves nothing. Although the Majority recognizes and agrees that "the 'high-crime area' label has been overused,"[83] and that its treatment under the

---

[83] Maj. Op. at 17.

current state of the law is an "apparent problem,"[84] the Majority passes upon the opportunity to do anything about it. The Majority pays lip service to the suggestion that courts should treat such designations with "caution," and claims that "merely intoning buzzwords" is insufficient.[85] But the Majority's analysis does not follow through on those warnings in any meaningful way.

The Majority suggests a variety of factors that a suppression court "may" consider when it is deciding whether a given area is "high-crime."[86] But the Majority ensures that the inquiry remains wholly toothless by declaring immediately thereafter that "these factors are discretionary, not mandatory," that it "is ultimately up to the suppression courts to determine if the Commonwealth has met its burden of proof," and, most significantly, that the court may "determine in its sole discretion what weight to assign to this factor."[87] In other words, the court may consider whatever it wishes to define the boundaries of a "high-crime area," and it may give that determination whatever significance it pleases.

The Majority satisfies itself that it is providing guidance for lower courts, which it trusts lower courts to follow.[88] A simple question reveals the lack of substance in this exercise: when would a suppression court's decision on this matter ever be reversed? If all of the considerations that the Majority identifies are purely discretionary, then, by

---

[84]     *Id.* at 18.

[85]     *Id.* at 1.

[86]     *Id.* at 25-26 (suggesting consideration of "a variety of factors, including, but not limited to: the geographic scope of the high-crime area; the nexus between the type of crime the area is known for and the type of crime suspected on the day of the stop; the officer's level of familiarity with the area; the recency of the officer's information; empirical data known to the officer; and the assignment of specialized police units targeting high-crime areas").

[87]     *Id.* at 26.

[88]     *Id.* at 27 n.13.

definition, a court may decline to consider them entirely. If the weight to be assigned to the high-crime area designation is then left to the "sole discretion" of the suppression court as well, then necessarily the court may give it any amount of weight. Even if a suppression court were to disregard every one of the Majority's suggestions and cautionary admonitions (which the Majority freely allows it to do), upon what basis could a reviewing court differ? So long as there is a bare assertion of the magic words "high-crime area" somewhere in the record, upon what basis could an appellate court properly applying its standard of review find reversible error? It is not clear if the Majority intends to engraft some sort of abuse-of-discretion standard into the inquiry—the typical appellate standard of review over discretionary decisions.[89] Regardless, because the Majority leaves suppression courts the option to disregard any and all of its recommended considerations, it is difficult to imagine how such discretion ever could be abused. The real-world effect is simply that both the factual finding and the legal usage of the "high-crime area" designation will be effectively unreviewable going forward.

Despite its words of caution about the overuse or misuse of the "high-crime area" designation, the Majority articulates no legal standard; it invites a free-for-all. In practice, today's decision will make no difference to the outcome of future cases. Police officers will stop and frisk people where they believe it is appropriate to do so, suppression courts

---

[89] *See, e.g.*, *Commonwealth v. Smith*, 325 A.3d 513, 519 (Pa. 2024) (citing *Commonwealth v. Talley*, 265 A.3d 485, 530 (Pa. 2021)) (explaining that an abuse of discretion is "not simply an error of judgment, but is an overriding misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality"). The abuse-of-discretion standard notably differs from the standard of review over suppression rulings, which is "limited to determining whether the suppression court's factual findings are supported from the record and whether the legal conclusions drawn from those facts are correct," with questions of law reviewed *de novo*. *Commonwealth v. Jones-Williams*, 279 A.3d 508, 515 (Pa. 2022) (quoting *Commonwealth v. Shaffer*, 209 A.3d 957, 968-69 (Pa. 2019)); *see* Maj. Op. at 5-6 (citing standard and scope of review over suppression rulings).

will defer to police decision-making, and appellate courts will defer to suppression courts' discretion. There will be no concrete grounds upon which a reviewing court can check the misuse of this factor. We can say all of the cautionary words that we please, but unless we issue a holding more meaningful than "trial court discretion prevails," the abuses that inhere in the law's treatment of "high-crime areas" will continue unabated.

## V. The Instant Case

It is something of an irony that, despite all of this discussion of the implications of the "high-crime area" label, the instant case reveals precisely why the designation is not necessary to a coherent and fact-based determination of reasonable suspicion. As the Majority and Justice Donohue's dissent thoroughly discuss, the police officers in this case observed Lewis among a group of men on the street in Philadelphia who appeared to be engaged in street gambling, which is unlawful under the Philadelphia City Code.[90] Upon making this observation, the police officers possessed reasonable, articulable suspicion that each member of the group was violating that law. When Lewis then fled upon seeing the police officers, there were thus lawful grounds to pursue him, and the firearm that he abandoned during the pursuit was recovered lawfully for all of the reasons that the Majority discusses in connection with that issue.[91] But, critically in my view, the character of the surrounding neighborhood as being "high-crime" or "known for gambling"[92] changes nothing about the lawfulness of the officers' actions.

In this regard, I respectfully differ with Justice Donohue's suggestion that the officers lacked reasonable suspicion as to Lewis because the testimony established that Lewis "was just with a group of individuals" who appeared to be gambling, and that Lewis

---

[90]     *See* Maj. Op. at 2 n.1, 31-32 & n.16; Diss. Op. (Donohue, J.) at 7.

[91]     *See* Maj. Op. at 29-31.

[92]     *Id.* at 31; *see id.* at 3, 11.

was not specifically identified as one of the men holding cards or money in his hands.[93] This reasoning demands a degree of certainty that the *Terry* doctrine does not require. Reasonable suspicion is not so rigid; it does not "deal with hard certainties, but with probabilities" and it allows an officer to draw "certain common sense conclusions about human behavior."[94] When observing a group of men who appear to be gambling on the street together, common sense suggests that it is reasonable to suspect that all of the men may, in fact, be gambling together. This is true even if not all of the men are observed holding cards, money, dice, etc., at all times during the game. The situation can be likened to the childhood game of "hot potato"—at any snapshot in time, perhaps only one player is holding the potato, but all of the players in the circle are playing the game.

There was, moreover, no indication that Lewis was merely walking past the group on the sidewalk, or that he was an unrelated bystander. Officer Whatley testified that he suspected four or five men of gambling because the members of the group—of which Lewis was one—were "on the sidewalk standing around the steps of the house," and "they appeared to be gambling" because they were standing "close together" and he saw "money in some of the individual's hands as well as cards in other individual's hands."[95] This is nothing like the situation in a case like *Ybarra v. Illinois*, where police officers unlawfully detained and searched every person who happened to be in a tavern when the officers executed a search warrant.[96] It is not a circumstance of "mere propinquity to others independently suspected of criminal activity."[97] Lewis was one of the men in the

---

[93]    Diss. Op. (Donohue, J.) at 8.

[94]    *Cortez*, 449 U.S. at 418.

[95]    Notes of Testimony, 12/8/2021, at 9.

[96]    *See Ybarra v. Illinois*, 444 U.S. 85 (1979).

[97]    *Id.* at 91 (citing *Sibron v. New York*, 392 U.S. 40, 62-63 (1968)).

group reasonably suspected to be engaged in gambling together, as a group, based on their specific, articulable conduct.

The contrary rationale essentially would require a guarantee that Lewis was engaged in a crime. It is possible that he was not; but that is not the question that a reasonable-suspicion inquiry asks. Perhaps the men were not actually gambling. If they were, perhaps Lewis was not, in fact, a participant. A "determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."[98] *This* is what is meant by the suggestion that the *Terry* doctrine "accepts the risk that officers may stop innocent people."[99] However, such a risk is acceptable only where the facts giving rise to reasonable suspicion are particularized to observable and articulable conduct of the individual seized. Here, that standard was met. I accordingly agree with the Majority as to the ultimate disposition of the instant case.

## VI. Conclusion

My concern is not with the result of this case, but rather with the law going forward. Although I agree that the seizure before the Court today was lawful, I do not believe that the suggestion that it took place in a purportedly "high-crime area" had anything to do with its legality.

Continued reliance upon the "high-crime area" factor is nothing more than an unjustifiable and unnecessary thumb on the scale, always weighing against "the right of every individual to the possession and control of his own person."[100] For too long, too many have been deprived of their fundamental right under the Pennsylvania Constitution

---

[98] *United States v. Arvizu*, 534 U.S. 266, 277 (2002) (citing *Wardlow*, 528 U.S. at 125).

[99] *Wardlow*, 528 U.S. at 126.

[100] *Terry*, 392 U.S. at 9.

to be "secure in their persons,"[101] and have been subject to unreasonable intrusions upon their liberty due to little more than their misfortune to live or work in a "high-crime area." The time has come for our law to reject this practice. Federal law may do as it will, but at least under the Pennsylvania Constitution, we should no longer "tar people with the sins of their neighbors."[102] Instead, we should hold that the protections of the Pennsylvania Constitution do not shrink upon crossing the borders of any city, municipality, or neighborhood in this Commonwealth.

I concur in the judgment of the Court. Otherwise, I respectfully dissent.

---

[101] PA. CONST. art. I, § 8.

[102] *United States v. Montero-Camargo*, 208 F.3d 1122, 1139 n.32 (9th Cir. 2000).